IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| JOHN HUFF, III, | Case No. 1:20-cv-02499-DAP |
| Plaintiff, | Judge Dan Aaron Polster |
| | Magistrate Judge Thomas M. Parker |
| vs. | |
| SANGEETA T. MAHAJAN, M.D., *et al.*, | |
| Defendants. | |

**PLAINTIFF'S TRIAL BRIEF**

I.    **INTRODUCTION**

Plaintiff John Huff, III ("Huff") filed his Complaint against Defendants Sangeeta T. Mahajan ("Mahajan") and Katen Pabley ("Pabley") (collectively "Defendants") alleging three causes of action: filing false information returns under 26 U.S.C. § 7434 (Count I, both Defendants), breach of fiduciary duty (Count III, Mahajan only), and fraud (Count IV, both Defendants). The case stems from litigation that has been pending in the Cuyahoga County Common Pleas Court for over seven years involving these parties and others arising from the failure of a company called Purushealth, LLC ("Purus"), which manufactured nutritional bars. Defendants' Counterclaims filed in this case against Huff have been dismissed with prejudice upon Huff's Motion for Summary Judgment.

Mahajan was the majority and tax matters member of Purus, and her husband Pabley served as CEO prior to his conviction and incarceration for bank fraud. Both intentionally duped an accounting firm into filing false K-1s issued by Purus to Huff, who was a member, CFO/COO and later CEO of Purus after Pabley's incarceration. Defendants willfully took this action to falsely inflate Huff's income in an attempt to coerce him into settling the state court lawsuit,

1

while at the same time improperly gaining a tax deduction for Mahajan. It also made good on a promise Mahajan made to Pabley while he was in prison to "destroy" Huff. Federal statutory law and Ohio common law will not tolerate such abuse of tax filings and positions of authority in an Ohio limited liability company.

II.     **WHAT THE EVIDENCE WILL SHOW**

   A.     **Mahajan and Pabley Induced Huff to Join Purus but did not tell him Pabley was About to go to Prison.**

Before meeting Defendants Huff had a successful career in business, an MBA, a good job and a growing family. In May 2013, Defendants recruited Huff to become the chief financial officer and chief operating officer of Purus. They promised Huff great opportunity for economic growth and personal fulfillment. But, unfortunately, they concealed from Huff that Pabley was under federal criminal investigation for conspiracy and bank fraud related to various mortgage frauds. At the time he resigned his previous employment and joined Purus, Huff had no idea Pabley, the Purus CEO, was the target (along with his mother) of the federal criminal probe. Pabley was later indicted and pleaded guilty to conspiracy, and he received a sentence of 32 months in federal prison.

Huff could have (and probably should have) walked away from Purus when the prison cell closed on Pabley. But he persevered and accepted the role of Purus' CEO and tax management member ("TMM") in an effort to save the business. Huff frantically tried to raise capital to save the business but Pabley's criminal conviction and Mahajan's refusal to invest any money made this an impossible task. Huff served as Purus' CEO and TMM until he resigned in June 2015 when the assets of Purus were seized and sold by its senior secured lender in accordance with Ohio Rev. Code § 1309. The state court litigation ensued shortly thereafter, *Purushealth, LLC, et al. v. Good Nutrition, LLC, et al.* Case No. 15-CV-851394, Cuyahoga

2

County Common Pleas Court. After Huff resigned, Mahajan acted as the Purus CEO and TMM, which meant that Mahajan owed fiduciary duties to the other Purus members, including Huff. She owned approximately 89% of the shares.

> **B.** **Mahajan and Pabley Duped Accountants into Preparing False K-1s for Huff by Withholding and Misrepresenting Material Information, for the Purpose of Forcing Huff to Settle the State Court Case and to Otherwise Harm Him.**

> **1.** **Mahajan and Pabley Provided False Information to Accountants.**

Beginning in late 2017, Defendants undertook the actions that are at issue in this case. With the help of one of their attorneys in the state case, Mark Ondrejech ("Ondrejech"), Defendants retained Gary Cerasi ("Cerasi"), Charlton Beilstein ("Beilstein") and their accounting firm Creative Business Strategies, Inc. (the "Accountants"), and knowingly supplied them with false information about Huff which led to the preparation and filing of false and fraudulent tax returns and K-1s for Huff for 2014 and 2015. Defendants did not go back to Purus' previous accountants to prepare the returns, and instead shopped around until they found willing ones in the Accountants. Huff sued the Accountants in this case but have dismissed them with prejudice.

Cerasi will testify that "All of the documentation and information" that he "relied upon in preparing the Purus tax returns and the Huff K-1s came from Mahajan and Pabley." He'll say "Mahajan and Pabley only provided the documents they selected," and they did not provide a copy of Huff's employment agreement with Purus. The employment agreement showed Huff was entitled to expense reimbursements he made on behalf of Purus. Mahajan and Pabley prepared a document entitled "Questionable Bank Transfers to John Huff" which they gave to the Accountants. This document contained false information. Cerasi will testify that he "asked Pabley and Ondrejech for Huff's phone number so I could contact him to discuss" the

3

questionable payments, but "[t]hey told me that Huff was not cooperating and that I probably would not receive a response," and thus Cerasi never spoke to Huff. Cerasi accepted the assertions made by Mahajan and Pabley regarding the payments to Huff, and Cerasi "reclassified them as taxable income in the form of Guaranteed Payments to Huff on the Huff K-1s," resulting in an increase in Huff's taxable income for 2014 and 2015, and an improper tax deduction for Mahajan.

Defendants concealed their actions from Huff, who had no idea they hired the Accountants to prepare his K-1s. The Accountants filed the amended 2014 return and the 2015 return in February 2018, and prepared the corresponding amended 2014 K-1 and 2015 K-1 for Huff, which significantly increased Huff's tax liability. The evidence will show Huff had no knowledge this occurred at the time. The evidence will show Defendants' fraudulent actions undertaken with the help of their state court lawyer Ondrejech and the Accountants also caused Mahajan to improperly realize tax benefits to which she was not entitled. After the Accountants gave the filed tax documents to Defendants in February 2018, they instructed them to provide copies to Huff, as they were required to do. But Defendants didn't provide the K-1s to Huff until August 30, 2018, after the deadline for Huff to contest the 2014 tax filings. The K-1s were belatedly delivered to Huff c/o of the Ondrejech law offices.

### 2. The Accountants Learned Mahajan and Pabley Lied to Them.

The evidence will show that as part of this lawsuit, Huff provided Cerasi the documentation that Defendants had withheld from him, despite Defendants being in possession of it. These documents included Huff's Purus expense reports, American Express statements in support of the expense reports, Purus wire transfers to Huff, and documents related to a $77,000 tax payment to Purus,  Cerasi will testify "The expense records and Huff's employment

4

agreement show that the wire transfers were reimbursements to Huff for Purus expenses Huff advanced from his own funds; and, the official company records of Purus…show that the $77,000 was reimbursed from the tax authorities to Purus, and that this payment should not have been classified as a guaranteed payment to Huff." Cerasi will say the documents Mahajan and Pabley withheld and Huff later provided "substantiate that those expenses are properly Purus business expenses that [Huff] paid from his personal account in 2014 and 2015. Huff submitted those expense reports to the Purus controller for reimbursement on a timely basis and in a normal business manner in the relevant tax years." Cerasi will also testify that a $155,000 wire transfer to a company called Good Nutrition incident to an Article 9 sale was not made to Huff and was improperly classified as guaranteed income to Huff on his K-1. Cerasi will state that he had erroneously attributed the $155,000 payment as guaranteed income to Huff based on false statements made by Pabley that Purus made the payment to Huff.

      With the benefit of the complete documentation and not simply the hand-picked records and representations of Defendants, Cerasi has sworn and will say again: "The complete materials I have now been provided, all of which Mahajan, Pabley and Ondrejech withheld from me, show that statements made to [Cerasi] by Mahajan and Pabley . . . were misleading, incomplete, inaccurate and led to the preparation of K-1s that incorrectly classified the reimbursements to Huff as Guaranteed Payments and taxable income to Huff." Due to the actions of Mahajan and Pabley, "Huff's taxable income on the Huff K-1s was consequently wrongfully overstated for the years 2014 and 2015." Cerasi will say that "[t]he Huff K-1s that [he] prepared are inaccurate and improperly charge Huff with taxable income from Purus in the form of Guaranteed Payments in the amount of $402,245." Cerasi will affirm that had he "been provided the necessary and

5

authentic documents from Mahajan, Pabley and Ondrejech" he "would not have prepared the Huff K-1s in the manner that [he] did." (*Id.* ¶ 59.)

Cerasi's own admission that the tax documents were inaccurate and false is confirmed by the expert report of CPA James Leikin, who "found that the amendments to the 2014 Partnership Return of PurUS Health, LLC by [Cerasi] were not supported by the documentation I reviewed, and this filing was inaccurate." Leikin further opined that "the classifications on the amended 2014 return and the 2015 return (and the related Form K-1s issued to Huff) were incorrect." (*Id.* p. 4.) Simply stated, the Accountants that prepared the information returns at issue in this case will testify under oath that they were false because of the fraudulent misrepresentations and concealment of Mahajan and Pabley.

### 3. Defendants Acted Willfully in Procuring the False Information Returns for Huff.

The evidence will also show that Defendants acted willfully in the preparation and filing of false and fraudulent information returns for Huff. Cerasi will attest: "Mahajan, Pabley and Ondrejech submitted false, misleading and incomplete documentation and information to [Cerasi] for the sole and wrongful purpose of having tax returns prepared to reduce their tax liabilities while at the same time increasing Huff's." This was no accident. Defendants had documents in their possession showing that Huff's claimed expenses were legitimate, both through discovery in the state court case and because Huff submitted documents with his expense reports when he worked for Purus.

Defendants and their state court attorney Ondrejech told Cerasi about the pending state case, and they also "discussed their objective to settle the state court litigation after the filing of the Amended 2014 K-1." Notes from the meeting, taken by Beilstein, state: "amend 2014 K1's by April 2018, then settle in court June 2018." When Cerasi received the completed tax

6

documents in February 2018, he "instructed Mahajan, Pabley and Ondrejech to promptly deliver copies of the returns and K-1s to each Purus member, including Huff. I specifically told them that Huff must immediately be provided with the Huff K-1s." Defendants nevertheless waited until September 2018 to give the documents to Huff, after the deadline for Huff to contest the 2014 filings had expired. This is devastating evidence of their intent to harm Huff and that evidence is undisputed.

### III. THE CLAIMS

#### A. Huff will Prove his 26 U.S.C. § 7434 Claim Against Defendants (Count I).

Section 7434 of Title 26 of the U.S. Code provides for a civil cause of action for damages for the willful filing of fraudulent information returns. "If any person willfully files a fraudulent information return with respect to payments purported to be made to any other person, such other person may bring a civil action for damages against the person so filing such return." 26 U.S.C. § 7434(a). Cases within the Sixth Circuit have held that liability under Section 7434 is with the person or entity that was legally required to file the return, in this case Mahajan as the TMM and Pabley, her agent. *See Swartwout v. Edgewater Grill LLC*, Case No. 1:12-cv-130, 2013 U.S. Dist. LEXIS 97250, at *5 (W.D. Mich. July 12, 2013) ("the person required to file an information return can be held liable under the statute"); *Vandenheede v. Vecchio*, Case No. 12-12284, 2013 U.S. Dist. LEXIS 25845, at *6-*8, 2013 WL 692876 (E.D. Mich. Feb. 25, 2013).

"To establish a claim of tax fraud under 26 U.S.C. § 7434, Plaintiffs must prove: (1) that the Defendants issued 'information returns'; (2) that the information returns were fraudulent; and (3) that Defendants willfully issued fraudulent returns." *Pitcher v. Waldman*, Case No. 1:11-cv-148, 2012 U.S. Dist. LEXIS 152087, at *13, 2012 WL 5269060 (S.D. Ohio Oct. 23, 2012) (citations omitted). "Congress's rationale for enacting § 7434 was that '[s]ome taxpayers may

7

suffer significant personal loss and inconvenience as the result of the IRS receiving fraudulent information returns, which have been filed by persons intent on either defrauding the IRS or harassing taxpayers.' . . . Congress was aware of a problem – the malicious reporting of false payments – and designed § 7434 to afform a damages remedy for victims of that problem." *Liverett v. Torres Advanced Enter. Solutions LLC*, 192 F.Supp.3d 648, 653-54 (E.D. Va. 2016).

All three elements will be established in this case. The tax returns and the Huff K-1s are "information returns," the definition of which includes "any statement of the amount of payments to another person required by" various provisions of the tax code. *See* 26 U.S.C. § 6724(d)(1)(A). The tax filings in this case related to payments to Huff. Huff will be able to establish that the "information returns were fraudulent." The very accountants who prepared the returns upon the false and incomplete information supplied by Defendants will say that the returns were fraudulent.

Huff will also be able to establish that Defendants acted with the requisite willfulness. "With respect to the tax code, 'willfulness' is generally defined as the voluntary, intentional violation of a known legal duty," which also encompasses recklessness.[1] As set forth above, Defendants intentionally provided inaccurate information to the Accountants, and they further intentionally failed to provide them with additional information – which they had in their possession – to cause the Accountants to prepare and file fraudulent tax documents with the IRS. To make sure they succeeded in their scheme to harm Huff with the false information returns, Defendants intentionally disregarded the instructions of Cerasi to immediately deliver the K-1s to Huff and instead waited until after the statute of limitations for Huff to amend his 2014 taxes

---

[1] *Pitcher v. Waldman*, Case No. 1:11-cv-148, 2014 U.S. Dist. LEXIS 42148, at *18 (S.D. Ohio Mar. 28, 2014), *aff'd*, 591 Fed. Appx. 466 (6th Cir. 2015) (citing *Cheek v. U.S.*, 498 U.S. 192, 201 (1976) ("[W]here willfulness is a statutory condition of civil liability, we have generally taken it to cover not only knowing violations of a standard, but reckless ones as well.")).

had expired. Moreover, the evidence will demonstrate the improper motivations of Defendants for these false filings--to coerce Huff to settle the state court lawsuit. It also fulfilled a promise Mahajan made to her imprisoned husband to "destroy" Huff.

It is expected that Defendants will assert at trial that Huff is the villain and that he was to blame for the failure of Purus and the Article 9 sale of the company. This is their position in the state case. If they choose to rest their defense upon their claims in the state case, they will prove their improper intent in procuring the false and fraudulent information returns for Huff in this case. Pabley, the convicted financial fraudster, has also submitted an affidavit that he acted in "good faith" in procuring Huff's information returns at issue in this case. The documentary evidence and the testimony of the very accountants Defendants hired to carry out their fraudulent scheme demonstrates otherwise.

Under 26 U.S.C. Section 7434(e), the court must determine the proper income amount that should have been reported on the information returns. Huff will submit evidence that the false and fraudulent K-1s improperly increased his income for 2014-2015 by approximately $402,000. This increased his tax liability by about $92,000. Under Section 7434(b), upon a finding of liability, Huff is entitled to an amount equal to the greater of $5000 or the sum of "(1) any actual damages sustained…as a proximate result of the filing of the fraudulent information return…, (2) the costs of the action, and (3) in the court's discretion, reasonable attorneys' fees." Huff does not dispute that he has not yet been penalized by the IRS because of the fraudulent acts of Defendants. He copied the IRS on the complaint as was his obligation under Section 7434 and this has no doubt forestalled any enforcement action by the IRS.

### B. Huff Will Prove his Breach of Fiduciary Duty Claim Against Mahajan (Count III).

"The elements of a claim of breach of fiduciary duty in Ohio are (1) the existence of a duty arising from a fiduciary relationship, (2) the failure to observe the duty, and (3) an injury resulting proximately from that breach." *Rios v. Tower Hill Specialty Grp., LLC*, Case No. 1:20-cv-238, 2022 U.S. Dist. LEXIS 60124, at *16, 2022 WL 980752 (S.D. Ohio Mar. 31, 2022) (citing *Puhl v. U.S. Bank, N.A.*, 2015-Ohio-2083, 34 N.E.3d 530, 536 (12th Dist.)). Under Ohio Revised Code § 1705.281 (which was in effect from May 4, 2012 until it was repealed effective February 11, 2022), "members of a limited liability company owe to each other [] the fiduciary duty of loyalty and care." *Rios*, 2022 U.S. Dist. LEXIS 60124, at *16. *See also Shoregate Towers Partners LLC v. Antebi*, 2021-Ohio-2688, ¶ 136 (8th Dist.) (same).

The obligation also exists under Ohio common law. "[M]ajority shareholders generally have a fiduciary duty to minority shareholders. A limited-liability company, like a partnership, involves a fiduciary relationship, which imposes upon the members a duty to exercise the utmost good faith and honesty in all dealings and transactions related to the company." *Fornshell v. Roetzel & Andress*, LPA, 2009-Ohio-2728, ¶ 51 (8th Dist.); *Blair v. McDonaugh*, 177 Ohio App.3d 262, 277 (1st Dist. 2008) (same).[2] When a majority member acts in her own self-interest, to the detriment of the other members or the corporate entity, that constitutes a breach of her fiduciary duty. *McLaughlin v. Beeghly*, 84 Ohio App.3d 502, 506 (10th Dist. 1992).

---

[2] Further, under Ohio law, a member of an LLC can bring a direct action against the majority or controlling shareholder for breach of fiduciary duty when he has suffered a direct injury that is separate and distinct from any injury to the LLC. *Berryhill v. Khouri*, Case No. 10-CV-721073, 2011 Ohio Misc. LEXIS 364, at *4 (Cuyahoga Cty. C.P. Jan. 13, 2011).

Here, Mahajan, as a member, majority owner, CEO and TMM of Purus at the time owed a fiduciary duty to Huff, with respect to the tax matters of Purus. The evidence will show she breached that duty by causing the false tax documents to be prepared and filed, harming Huff by increasing his tax liability, while at the same time decreasing hers. Indeed, it is hard to conceive of a more egregious breach of fiduciary duty. Huff is entitled to collect the damages cause by this breach and, because of Mahajan's willful and wanton conduct, punitive damages and attorney's fees.

### C. Huff will Prove his Fraud Claim Against Defendants (Count IV).

Finally, Huff will prove his claim for fraud against Defendants. Under Ohio law, a claim for fraud can be based upon both an affirmative misrepresentation, "or, where there is a duty to disclose, concealment of a fact." *Williams v. Aetna Fin., Co.*, 83 Ohio St.3d 464, 475, 700 N.E.2d 859 (1998). The other elements are that the representation (or failure to disclose) was material, the representation was made falsely with knowledge of the falsity, it was made with the intent of misleading the other person, the other person reasonably relied upon the misrepresentation, and damages were proximately caused thereby. *Id*.

Defendants are liable for fraud in this case both for making affirmatively false misrepresentations, and due to their fraudulent concealment of material facts. First, and as will be shown at trial, they made affirmative false misrepresentations to the Accountants, which harmed Huff. Defendants then made affirmatively false misrepresentations to the IRS when they filed the fraudulent tax documents. "It is generally accepted that a plaintiff is not required to prove direct reliance on a fraudulent misrepresentation to state a claim for fraud." *Nernberg v. Pearce*, 35 F.3d 247, 250 (6th Cir. 1994). Thus, even though Defendants' misrepresentations

11

were made to Cerasi and the IRS, Huff can prevail on his fraud claim because he was harmed by the misrepresentations.

Moreover, Huff will prove his claim for fraud due to the intentional concealment by Defendants of these fraudulent tax filings. Defendants concealed their actions until after the deadline for Huff to contest the filings had passed. Under Ohio law, a claim for fraud due to intentional concealment of a material fact requires a duty to disclose that fact, which "arises primarily in a situation involving a fiduciary or other similar relationship of trust and confidence." *Andersons, Inc. v. Consol, Inc.*, 348 F.3d 496, 509 (6th Cir. 2003) (citing *Federated Mgmt., Co. v. Coopers & Lybrand*, 137 Ohio Spp.3d 366, 384, 738 N.E.2d 842 (10th Dist. 2000)).

## IV. CONCLUSION

Defendants went out of their way to hurt Huff out of spite and to seek an advantage in the state court litigation. They weaponized the U.S. Tax Code as part of their scheme. Federal statutory law and Ohio common law will not allow them to succeed.

Dated:  October 17, 2022     Respectfully submitted,

  /s/  *Robert A. Zimmerman*
Robert A. Zimmerman (0055478)
Allyson Cady (0098830)
BENESCH, FRIEDLANDER, COPLAN & ARONOFF, LLP
200 Public Square, Suite 2300
Cleveland, Ohio 44114-2378
Telephone:    216-363-4500
Facsimile:     216-363-4588
Email: rzimmerman@benschlaw.com
        acady@beneschlaw.com

*Attorneys for Plaintiff John Huff, III*

**Local Rule 7.1(f) Certification and Certificate of Service**

Pursuant to Local Rule 7.1(f), I hereby certify that the foregoing adheres to the page limitations.

I hereby certify that on October 17, 2022, a copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's system.

    /s/ *Robert A. Zimmerman*
    Robert A. Zimmerman
    *Attorney for Plaintiff John Huff, III*

13